ALLIED PAPER, INC.

v.

H.M. HOLDINGS, INC., Appellant; AMES et al., Appellees.

[Cite as *Allied Paper, Inc. v. H.M. Holdings, Inc.* (1993), 86 Ohio App.3d 8.]

Court of Appeals of Ohio,
Montgomery County.

No. 13374.

Decided Jan. 7, 1993.

*Jerome C. Tinianow,* for appellant.

*David M. Rickert,* for appellees.

FAIN, Presiding Judge.

Defendant and third-party plaintiff-appellant H.M. Holdings, Inc. ("Holdings") appeals from a summary judgment dismissing its third-party complaint against William H. Ames, C. William Simpson, and Richard Stewart and denying Holdings' motion for either total or partial summary judgment. The trial court ruled that Holdings had no cause of action for fraudulent inducement, negligent misrepresentation, and breach of fiduciary duty against Ames, Simpson, and Stewart because of language in the contract that purported to exculpate them from any liability with regard to breach of their warranties. Because we conclude that the exculpation clause applied only to liability arising out of the contract itself, we reverse the judgment of the trial court, and remand this cause for further proceedings consistent with this opinion.

I

This action arises out of a stock purchase agreement ("Agreement") dated October 19, 1988, between defendant and third-party plaintiff Holdings, and Allied Acquisition, Inc., which subsequently merged into plaintiff Allied Paper, Inc. ("Allied"). The Agreement provided that Holdings would sell its stock in the Allied Group, which was subsidiaries and related companies of Holdings, to Allied Acquisition. As part of the transaction, Holdings required that certain officers, who were key management personnel of the Allied Group and are now the third-party defendants, provide certificates certifying the truth of the warranties and representations made by Holdings to Allied. Holdings required these certificates because it had owned the companies for only two years, and each operating company was run independently under its own management; therefore, Holdings was not in a position to know the details of the transactions of the companies and had to rely on the managements of the companies to verify the representations. The persons, however, who were to provide these certificates were also to be shareholders and key management personnel of the succeeding corporation, Allied, and were to be paid a success fee by Allied if the sale indeed occurred. Although it was the officers of Holdings, the selling company, who were signing the certificates, it was the duty of Allied, the buyer, to deliver the certificates at the closing. Agreement Section 7.2(e).

Shortly after the closing, Allied hired a consulting firm to conduct an environmental survey of the Allied plants. In October 1989, after Allied received the reports from the consulting firm, Allied wrote to Holdings and demanded that Holdings "indemnify Allied Paper with respect to certain environmental liabilities" based on the environmental warranties and representations in the Agreement. Def.Exh. 198. Holdings declined to do so, on the basis that neither a

regulatory body nor any person had made any claim or demand against Allied relating to the environmental conditions, so there was nothing to indemnify, and the conditions did not constitute violations or breaches of representations and warranties. Def.Exh. 204.

Allied then brought this action against Holdings, alleging that Holdings had breached certain environmental warranties contained in Section 4.14 and seeking indemnification under Section 9.5 of the Agreement. Holdings then cross-claimed for contribution and indemnification from Ames, Simpson, and Stewart, who had provided the management certificates to Holdings, on the grounds of fraudulent inducement, oral misrepresentations, and breach of fiduciary duty. All parties brought motions for summary judgment; the trial court granted the motion of Ames, Simpson, and Stewart, and dismissed the third-party action. Holdings appealed.

## II

Holdings's sole assignment of error is as follows:

"The trial court erred in granting summary judgment to appellees and dismissing appellant's third-party complaint alleging fraud, negligent misrepresentation and breach of fiduciary duty."

Because the propriety of a summary judgment is a question of law, our review is *de novo*. *Bench Billboard Co. v. Dayton* (Apr. 10, 1992), Montgomery App. No. 13015, unreported, at 5, 1992 WL 80772. In reviewing an order of summary judgment, we construe the evidence and all rational inferences therefrom in the light most favorable to the nonmoving party.

A motion for summary judgment should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The question of whether a fact is material rests upon a legal determination of what facts are critical; the court should not grant a motion for summary judgment when the dispute about that fact is "genuine," that is, a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211. In this case, the substantive law to be applied is that of New York, because the Agreement provides that it is to be interpreted and enforced in accordance with the law of New York.

The trial court dismissed the complaint against Ames, Simpson, and Stewart on the basis that Holdings had waived the right to proceed against them in Section 9.2(e) of the Agreement. Section 9.2(e) provides:

"(e) *Certificate from Management of Allied.* Seller has obtained a certificate from each of the Management Members in substantially the form of Exhibit V.[1] Seller expressly agrees that Buyer and such individuals shall have no liability to Seller with respect to such certificates, except that in the event that Seller proves there was a breach of any such certificate, Seller's sole remedy shall be to increase the basket as provided for in Section 9.2(c)." (Footnote added.)

The facts that the basket[2] is increased upon the proof of a breach of the certificates and that it was the buyer's responsibility to deliver the certificates at Closing, see Section 7.2(e), are implicit recognition of the reality that the certificates were given by persons aligned with the buyer's side of the transaction, not the seller's.

The trial court reasoned that the words of Section 9.2(e) mean that Holdings has agreed not to hold Ames liable on *any* basis and that the sole remedy is to increase the basket. The trial court then concluded that the basket does not apply to environmental claims, based on the language of Section 9.2(c):

"(c) Seller shall have no liability under this Section 9 unless the aggregate amount of the Losses (defined as the amounts referred to in Section 9.1(a)) incurred by Buyer from all Claims exceed $250,000 and, in such event, Seller shall be required to pay only 50% of the first $350,000 of such Losses in excess of $250,000 and then 100% of the amount by which such Losses exceed $600,000; *provided, however,* that (x) in no event shall the amount of such liability exceed the Purchase Price and (y) the limitations set forth in this sentence shall not be applicable to the representations and warranties set forth in Section 4.7 or regarding tax and environmental claims * * *. In the event that Buyer asserts that Seller is liable for Losses other than for Losses under [certain other sections], and Seller proves that the Losses represent a breach of the management certificate referred to in Section 9.2(e), then the basket of $250,000 referred to above shall be increased by the amount of such Losses up to a maximum of an additional $250,000. The *indemnification provided for in this Section 9,* the License Agreement and the Tax Sharing and Indemnification Agreement *shall,* from and after the closing, *be the sole remedy* for any of the matters referred to herein and therein, respectively; it being expressly understood and agreed * * * that *indemnification under Section 9.5 shall be the sole remedy for any Environ-*

---

1. The certificates provide in pertinent part:
   "I have reviewed the representations and warranties set forth in Sections 4.3, 4.5, 4.6, 4.7, 4.8, 4.9, 4.11, 4.12, 4.14, 4.15, 4.16, 4.17, 4.18, 4.19, 4.20 and 4.21 of the Stock Purchase Agreement and the related schedules and, to my knowledge, such representations and warranties and schedules are true and correct in all material respects * * *."

2. The "basket" is the amount of the deductible that Allied would be responsible for paying before Holdings' liability would become activated.

*mental Claims* (as defined herein) *and for any breach of representation or warranty set forth in Sections 4.14(e) or (f) or otherwise regarding environmental matters * * *."* (Emphasis added.)

Sections 4.14(e) and (f) set forth the warranties and representations relating specifically to environmental issues. The trial court concluded that the basket does not apply to environmental claims, that indemnification is the sole remedy for environmental claims, and that Section 9.2(e) insulated Ames, Simpson, and Stewart from liability for breach of the management certificate; therefore, the court reasoned, Holdings did not have a cause of action against Ames, Simpson, and Stewart, and the trial court dismissed the third-party complaint.

Holdings argues that the trial court's interpretation of Section 9.2(e) and the dismissal of the third-party complaint renders the management certificates meaningless, because that leaves Holdings without a remedy in the event of wrongful conduct in connection with the management certificates and the environmental warranties. Allied, on the other hand, argues that it is not the function of the court to rewrite a contract that has been freely negotiated between two sophisticated parties, but, rather, that the plain meaning of the contract should be enforced.

We agree that the plain meaning of the contract should be enforced, provided that there is a plain meaning. In order to determine whether, as Holdings argues, the trial court has rendered the management certificates meaningless and whether there is a "plain meaning" of the contract with respect to environmental claims, it is necessary to examine Section 9 in its entirety.

Section 9 deals with indemnification and related matters. Subsection 9.1, which is subject to the provisions of subsection 9.2, provides for Holdings to *indemnify* Allied against (i) claims resulting from any of Holdings' misrepresentations or breaches of the Agreement; (ii) against claims made within one year of the anniversary of the closing date of the Agreement attributable to products of the company; (iii) claims made with respect to any pension plan arising prior to the closing; (iv) matters set forth in Schedule 4.14(b) relating to litigation and workers' compensation claims; (v) claims arising from the ownership or operations of assets, properties, or subsidiaries, including stock, that are not part of the business as of the closing date, including items on Schedule 9.1; (vi) claims resulting from the seller's failure to deliver all the outstanding capital stock that was the subject of the Agreement; (vii) claims relating to the real property lease in Miamisburg, Ohio; (viii) claims relating to the termination of employment of those individuals shown on Schedule 9.1; and (ix) actions and expenses relating to settlement or compromise of the foregoing. Allied agreed to indemnify Holdings against other, similar types of claims, including claims made after the first anniversary of the closing date of the Agreement.

Subsection 9.2 relates to the determination of damages and provides, among other things, that (1) Holdings shall receive credit for any insurance recoveries made when calculating amounts payable under Section 9.1(a) or 9.5; (2) that indemnification is the sole remedy for environmental claims; and (3) Ames, Simpson, and Stewart have no liability to the seller for breach of the management certificates.

Subsection 9.3 provides that certain claims against the other party for damages arising out of their respective misrepresentations or breaches of warranties under the agreement must be made within one year of the closing.

Subsection 9.4 provides that when a third-party claim is made against either party which, if sustained, would give rise to indemnification under the Agreement, notice of the claim and an opportunity to defend the claim directly will be given to the other party.

Subsection 9.5 is entitled "Environmental Matters." It provides, "*notwithstanding anything to the contrary* contained in this Agreement," that any and all environmental liability resulting from any breach of the representations or warranties relating to any violation or alleged violation of federal, state, or local statute or any claim for personal injury or property damages relating to materials of the company are to be allocated between the parties according to the time the claim is made and the time that the exposure resulting in the claim occurred. Generally speaking, if the claim arose before the closing date, Holdings would be one hundred percent responsible; if the claim arose or the event or exposure causing liability was entirely after the closing date or Allied failed to give notice of the claim before the first anniversary date of the closing, Allied would be one hundred percent responsible; in other cases, the liability would be apportioned between the parties based on the length of time after the closing date that the event or exposure occurred. Subsection 9.5(b) provides that if the claimant was an employee or former employee, the allocation of liability is done in a manner similar to that for other claimants. Subsection 9.5(c) provides that, if Holdings is not obligated to indemnify, it will cooperate in procuring benefits under any insurance policies that might be in effect with respect to the environmental liability.

This summary of these provisions of the Agreement shows the relationship of the subsections and shows that all subsections of the Agreement can be given effect. First, Agreement Section 9.2(c) provides that "indemnification shall be the *sole remedy* for *any environmental claim* * * * and for any breach of representation or warranty set forth in Sections 4.14(e) or (f) or otherwise regarding environmental matters * * *." Section 9.5 provides that "*[n]otwithstanding anything to the contrary* contained in this Agreement," indemnification for claims is allocated according to the provisions of that subsection. As

indemnification is the sole remedy for environmental claims, notwithstanding anything to the contrary in the agreement, then Section 9.3, regarding time and manner of claims between the parties, *does not apply to environmental claims*, but only to breaches of other types of warranties. The sole remedy for environmental claims is expressly stated to be indemnification, and under Section 9.5 Holdings is completely liable only for those claims in subsection (a), essentially those that arose before the closing date and where the claim was made against Allied and Allied notified Holdings of the claim within a year of the closing date.

The basket referenced in Section 9.2(c) does not apply to environmental claims, because (*1*) the sole remedy is indemnification, and (*2*) the liability for indemnification of environmental claims has been separately allocated under Section 9.5. Holdings' release of any contractual liability of Ames, Simpson, and Stewart under Section 9.2(e) can be seen as a rational assumption of a business risk, because Holdings' potential liability for one hundred percent indemnification extends for only one year.

Indemnification clauses under New York law apply to claims by third parties, whereas exculpation clauses refer to releasing one of the parties from that party's own negligence. Therefore, it appears that Allied is not entitled to have Holdings pay for the environmental cleanup, because no claims by third parties were made against Allied within the year following the closing. If a claim relating to a breach of the environmental warranties had been made by a third party against Allied, that claim would not have been subject to the dollar limitations set forth in Section 9.2(c), which expressly excludes environmental claims, but instead would have been allocated under Section 9.5.

■ Contracts must be read as a whole, and they must be interpreted in such a manner as to give effect to every provision. *Corhill Corp. v. S.D. Plants, Inc.* (1961), 9 N.Y.2d 595, 599, 217 N.Y.S.2d 1, 3, 176 N.E.2d 37, 38. This reading of the contract fulfills that cardinal rule of construction, because every provision has meaning.

■ At the oral argument of this appeal, Holdings argued that public policy precludes a provision in a contract exculpating a party from liability for breaching, in bad faith, a warranty given pursuant to the contract.[3] Holdings points to evidence in the record suggestive of bad faith on the part of Ames, Simpson, and Stewart. Although the issue is close, we conclude that public policy does not

---

**3.** Neither party has argued the public policy issue from the perspective of New York law, nor has either party cited New York authority for the public policy argument. Accordingly, in considering this issue we have confined ourselves to determining whether the provision in the contract documents for the limitation or exculpation of liability for a bad faith breach of warranty offends the public policy of Ohio.

prevent the contract that provides for the giving of certain warranties from also barring or limiting liability for the bad faith breach of those warranties.

From the viewpoint of the warrantor, he may be exposing himself to great liability for little or no benefit to himself. It may be rational to immunize the warrantor from liability, even if a jury should ultimately find that the warrantor acted in bad faith. The warrantor may have a legitimate need, under those circumstances, for protection from an adverse jury verdict upon the issue of bad faith. In other words, a warrantor may legitimately take the position that, "I know that I am not in bad faith, but I need protection from the possibility that a civil jury may, nevertheless, find me to have been in bad faith." From the viewpoint of the warrantee, an immunization from monetary liability may also be rational; it may be the best assurance obtainable under the circumstances, and it may not be entirely unreliable because of the loss of reputation that is likely to enure to the businessman whose certification is ultimately revealed to be a falsehood. For these reasons, we conclude that a contract providing for the giving of a warranty may provide its own immunization or limitation of liability for breach of the warranty, even when the breach is found to have been in bad faith.

▇▇▇ Holdings argues further that its fraud claim cannot be barred by a contractual limitation, first pointing out that Section 9.2(e) does not purport to restrict Holdings' right to recover for Ames, Simpson, and Stewart's fraud. We agree. Under New York law, a contract cannot insulate a person from liability for fraud in making the contract. Enforcing such a provision would violate the public policy and destroy the barriers that have been erected against fraudulent dealing. The New York Court of Appeals stated in 1894:

"[A] party who has perpetrated a fraud upon his neighbor may [not] contract with him, in the very instrument by means of which it was perpetrated, for immunity against its consequences, close his mouth from complaining of it, and bind him never to seek redress. Public policy and morality are both ignored if such an agreement can be given effect in a court of justice. The maxim that fraud vitiates every transaction would no longer be the rule, but the exception. It could be applied then only in such cases as the guilty party neglected to protect himself from his fraud by means of such a stipulation. Such a principle would in a short time break down every barrier which the law has erected against fraudulent dealing." *Bridger v. Goldsmith* (1894), 143 N.Y. 424, 428, 38 N.E. 458, 459.

The court discounted the argument that because the parties bargained for the clause the plaintiff should be required to abide by it; the defendant had knowledge that the statements were false, while the plaintiff relied on the truth

of the representations and readily signed the agreement. The court of appeals refused to allow such a provision to defeat a cause of action for fraud.

■ Similarly, with respect to Holdings' second cause of action, New York law requires that clauses that exculpate a party from its own negligence must be written in clear and unequivocal language to show that the intent of the parties is in fact that result. See *Ciofalo v. Vic Tanney Gyms, Inc.* (1961), 10 N.Y.2d 294, 297, 220 N.Y.S.2d 962, 964, 177 N.E.2d 925, 926; *Gross v. Sweet* (1979), 49 N.Y.2d 102, 108, 424 N.Y.S.2d 365, 368, 400 N.E.2d 306, 310.

■ Ames, Simpson, and Stewart argue that language using the terms "negligence" or "fault" is not necessary when the exculpatory language is drafted at arm's length by sophisticated parties. However, the cases they cite in support of that proposition are cases interpreting indemnification clauses that allocate the risk of liability to third parties, often by means of insurance, rather than exculpatory clauses that limit the parties' own liability, such as they are arguing exists here. *Hogeland v. Sibley, Lindsay* (1977), 42 N.Y.2d 153, 397 N.Y.S.2d 602, 366 N.E.2d 263; *Levine v. Shell Oil Co.* (1971), 28 N.Y.2d 205, 321 N.Y.S.2d 81, 269 N.E.2d 799. There appears to be a significant difference between the situation where one party agrees to indemnify another against claims by a third party, and the situation where one party is attempting to insulate himself from his own fraudulent or negligent acts. Where the indemnification provision is seen merely as allocating the risk of liability to third parties, such as through the use of insurance, less precise language will be enforced as long as the agreement shows the unmistakable intent of the parties to do so. *Gross, supra*. The existence of more than one interpretation requires a finding that indemnification was *not* the unmistakable intent of the parties. *Ruhland v. John W. Cowper Co.* (1979), 72 A.D.2d 907, 907, 422 N.Y.S.2d 182, 183. Moreover, agreements purporting to grant exemption for willful or grossly negligent acts are wholly void. *Gross*, 49 N.Y.2d at 105, 424 N.Y.S.2d at 366, 400 N.E.2d at 308.

Therefore, the language in Section 9.2(e) stating that Ames, Simpson, and Stewart "shall have no liability to Seller" is void to the extent that it attempts to insulate them from fraudulent, intentional, willful, or grossly negligent acts. Another basis for not enforcing the clause with respect to intentional or negligent tortious acts is that the language of the clause does not make it absolutely clear that the parties intended to relieve Ames, Simpson, and Stewart from liability for anything other than breach of contract, as a breach of warranty is a contract claim, not a tort claim.

It would be a travesty of justice to allow one party to take advantage of the ignorance of the other, and then allow that other to contract away the right to recover for damages caused by the first party's fraud. We interpret Section

9.2(e) as a limitation of Holdings' right to sue Ames, Simpson, and Stewart with respect to a contractual claim of breach of the certificates, but not as a total exculpation from liability for fraudulent, intentional, willful, or negligent acts.

Ames, Simpson, and Stewart argue that Holdings failed to raise the issue before the trial court that the oral misrepresentations were outside the scope of Section 9.2(e). We note that that claim was discussed in Holdings' memorandum in opposition to Allied's and the third-party defendants' motions for summary judgment. Furthermore, it was the third-party defendants who failed to give notice to Holdings that they were relying on lack of evidence of the oral misrepresentations as a basis for summary judgment. As they failed to give notice of that issue, Holdings had no duty to respond to it.

Holdings argues, relating to its third cause of action, that Section 9.2(e) does not shield Ames, Simpson, and Stewart from liability with respect to a breach of their fiduciary duties to Holdings. We agree.

Ames, Simpson, and Stewart were all officers of the Allied Group, of which Holdings was the sole shareholder. Officers of a corporation owe fiduciary duties of due care and loyalty to the shareholder. *Quasha v. Am. Natural Beverage Corp.* (1991), 171 A.D.2d 537, 567 N.Y.S.2d 257, citing *Giblin v. Murphy* (1988), 73 N.Y.2d 769, 536 N.Y.S.2d 54, 532 N.E.2d 1282; *Singer v. Magnavox Co.* (Del.1977), 380 A.2d 969, overruled on other grounds in *Weinberger v. UOP, Inc.* (Del.1983), 457 A.2d 701. Silence as to material facts may constitute fraud where there is a fiduciary relationship. *Id.* Corporate officers simply "are not permitted to use their position of trust and confidence to further their private interests." *Guth v. Loft* (Del.1939), 23 Del.Ch. 255, 269, 5 A.2d 503, 510.

Under Delaware law, which governs the conduct of officers of corporations incorporated in Delaware, the duty of fair dealing requires that officers "disclose all material information relevant to corporate decisions from which they may derive a personal benefit." *Mills Acquisition v. Macmillan, Inc.* (Del.1988), 559 A.2d 1261, 1280. Liability attaches for a breach of fiduciary duty regardless of any actual intent to defraud as long as the officer puts himself in a position of conflicting loyalties. *Ohio Drill & Tool Co. v. Johnson* (C.A.6, 1980), 625 F.2d 738, 742; see *Mills Acquisition, supra.*

Ames, Simpson, and Stewart argue that they were under no duty to sign the certificate of management and did so only on the promise of no liability. The latter part of that statement is contradicted in the record; therefore, it cannot be the basis of summary judgment. Furthermore, their claim that they were under no duty to sign the certificate does not obviate their fiduciary duty to disclose all material information to the corporation and its shareholders.

There are facts in the record from which a reasonable jury could conclude that Ames, Simpson, and Stewart, officers of the corporation whose shares were sold, were in a position to derive personal benefit from the sale at the time that they owed a fiduciary duty of good faith and fair dealing; that they had a duty relating to the warranties and representations that were the subject of the management certificates; and that they did not disclose all material information to the shareholder, Holdings. There is evidence in the record from which a reasonable jury could conclude that the failure to disclose information was a breach of their fiduciary duty. Therefore, the trial court erred in dismissing the third cause of action against Ames, Simpson, and Stewart for breach of fiduciary duty.

Holdings' sole assignment of error is sustained.

### III

Holdings' sole assignment of error having been sustained, the summary judgment rendered in favor of the third-party defendants is reversed, and this cause is remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

WILSON and BROGAN, JJ., concur.