OPINION
{¶ 1} PPG Industries, Inc. ("PPG"), defendant-appellant, appeals two judgments of the Franklin County Court of Common Pleas, in which it denied PPG's motion for judgment notwithstanding the verdict and awarded attorney fees against PPG. Peter Luft, plaintiff-appellee, has filed a cross-appeal with regard to the trial court's judgments granting summary judgment to various parties and denying prejudgment interest.
 {¶ 2} In February 1989, Luft had a barn, walkway ("walkway I"), and garage ("garage I") constructed on his property by Perry County Lumber Supply Company ("Perry"). The wood that was used to construct the buildings was pre-stained by Forest Products Group, Inc. ("Forest") allegedly using Olympic paint supplied by Francis-Schulze Company ("Francis-Schulze"). Olympic paint is manufactured by PPG. Luft later noticed discoloration in a small area of the barn, and in June 1989, discussions were held between Luft, Francis-Schulze, Forest, and Perry regarding the discoloration. Luft claims that representatives from these three companies told him the problem would be "taken care of" by painting over the pre-stain with latex paint. Luft said that a representative from Francis-Schulze told him that the latex paint was "absolutely guaranteed" for 15 years, and Luft was shown an Olympic pamphlet that said the paint was guaranteed for 15 years. Luft testified that although the pamphlet also said to read the label on the paint can for full details of the guarantee, he did not notice such and was not personally directed to the paint can to see the full details and limitations of the guarantee. Perry subsequently hired Roger Bissell and Jim McGlade to repaint the barn, walkway I, and garage I, on or about July 1989. Francis-Schulze supplied the Olympic overcoat paint used by Bissell and McGlade. Luft did not discover until after filing the present action that Forest admitted to Perry in 1989 that it had accidentally allowed the paint from a previous paint job to remain on its brushes before pre-staining the wood for the structures, which had at least contributed to Luft's problems. Unbeknownst to Luft, Forest paid Perry $1,500 and gave Perry 30 gallons of Olympic overcoat paint in consideration for Perry releasing Forest from any liability. In 1991, Luft had Perry construct a second walkway ("walkway II") and second garage ("garage II"). Luft, with some help from assistants, painted walkway II and garage II, using Olympic overcoat paint Luft purchased from a retail store.
 {¶ 3} Luft testified in his November 8, 1999 deposition that, around Labor Day 1992, he noticed a problem with the paint Bissell and McGlade applied on garage I and walkway I. The paint was bleaching and turning white. The problem became progressively worse. In spring 1993, he tried to complain to Perry about the problem, but Perry never called him back. Although Luft was not certain as to the date, either in late 1993, 1994, or early 1995, Luft contacted PPG to complain about the performance of the paint. From June to December 1995, Luft had several meetings with two PPG representatives, John Clinton and Brad Jones. Clinton allegedly told him the problem was caused by a breakdown of the PPG product and PPG would take care of the problem. The concerns were not resolved in any of these meetings, and Luft tried to get PPG to come to the property throughout 1996, to no avail. In March 1997, Luft hired counsel to represent him with regard to the PPG paint. Luft held discussions with PPG representative Larry Work from December 1997 to May 1998.
 {¶ 4} On April 29, 1999, Luft brought an action against PPG, Perry, Forest, Francis-Schulze, Bissell, and McGlade, against whom he asserted the following claims: (1) fraud; (2) negligent misrepresentation; (3) negligence; (4) breach of contract; (5) breach of express warranty; (6) breach of implied warranty; (7) violation of the Ohio Consumer Sales and Practices Act ("CSPA"); and (8) product liability under R.C. 2307.71 (as to PPG, Perry, Forest, and Francis-Schulze only). An amended complaint was filed adding Greg Zink, an employee of Perry who purchased Perry in May 1990, and John Miller, who was the owner of Perry prior to May 1990, as defendants, which included the same claims as the original complaint.
 {¶ 5} In February and March 2000, various parties filed motions for summary judgment based upon the statute of limitations. The trial court granted summary judgment based upon the statute of limitations with respect to Forest, Zink, Miller, and Francis-Schulze. PPG's motion for summary judgment was denied, the trial court finding that a genuine issue of material fact existed as to whether the statue of limitations had expired as to PPG. The trial court partially granted Perry's motion for summary judgment with respect to the statute of limitations on all the claims except the claims surrounding the 1991 contract. On July 30, 2001, a jury trial commenced against Perry and PPG, and a directed verdict was rendered against Perry at the close of Luft's case. On August 9, 2001, the jury returned a verdict in favor of Luft, awarding a total of $117,000 in compensatory and punitive damages against Perry, and compensatory damages of $8,000 against PPG.
 {¶ 6} On August 16, 2001, Luft filed a motion for treble damages, attorney fees, and joint and several liability. On August 28, 2001, Luft filed a motion for pre- and post-judgment interest. On November 19, 2001, PPG filed a Civ.R. 50(B) motion for judgment notwithstanding the verdict ("JNOV"), arguing that Luft's claims against it were barred by the statute of limitations. The court denied the motion for JNOV, finding: (1) the jury interrogatories did not specify when the violations of the CSPA occurred, and PPG failed to submit interrogatories asking when the violations of the CSPA occurred; and (2) PPG waived the statute of limitations defense because it failed to actively pursue the defense at trial.
 {¶ 7} A hearing on Luft's post-trial motions was held on January 15, 2002. On February 13, 2002, the trial court issued a judgment, in which it: (1) trebled the compensatory damages against Perry; (2) awarded attorney fees and expenses against Perry of $87,827.25; (3) awarded punitive damages against Perry of $18,000; (4) trebled the compensatory damages of $8,000 against PPG; and (5) awarded attorney fees and expenses against PPG. On March 22, 2002, a hearing was held regarding the amount of attorney fees to be assessed against PPG. On April 9, 2002, the trial court issued a decision awarding attorney fees of $86,115.95 against PPG. PPG has appealed the trial court's judgments. Luft has also filed a cross-appeal. PPG asserts the following two assignments of error:
 {¶ 8} "I. The Trial Court Erred In Denying Defendant PPG's Motion For Judgment Notwithstanding The Verdict.
 {¶ 9} "A. Neither The Jury Interrogatory Responses Nor The Record Supports Any Reasonable Conclusion Other Than The Statute Of Limitations Had Expired Prior To The Filing of Plaintiff's Complaint.
 {¶ 10} "B. PPG Did Not Waive Its Statute of Limitations Defense.
 {¶ 11} "II. The Trial Court Erred By Abusing Its Discretion In Awarding Attorney's Fees In The Amount Of $86,115.95 Against The Defendant PPG.
 {¶ 12} "A. The Trial Court Failed To Allocate Attorney's Fees Between Those Incurred For Claims For Which Fees Are Recoverable And Those Claims For Which Fees Are Not Recoverable.
 {¶ 13} "B. The Trial Court's Award Of Fees Is Based Upon An Invalid Criteria Which Was Not Consistently Applied.
 {¶ 14} "C. An Award Of Attorney's Fees In The Amount Granted By The Trial Court Is Excessive.
 {¶ 15} "D. An Award of Attorney's Fees Is, Under The Facts Presented Here, Both Unreasonable and Inequitable."
 {¶ 16} Luft asserts the following two assignments of error in his cross-appeal:
 {¶ 17} "I. The trial court erred by denying prejudgment interest on the damages award against PPG.
 {¶ 18} "II. The trial court erred in granting summary judgment to appellees Francis Schulze, Forest Products Group, Inc., John A. Miller, Greg Zink, and Perry County Lumber."
 {¶ 19} PPG argues in its first assignment of error the trial court erred in denying its motion for JNOV pursuant to Civ.R. 50(B). We must first address Luft's contention that the trial court did not err in denying PPG's motion for JNOV because PPG failed to raise or argue the statute of limitations issue during trial, thereby waiving the argument. Our search of Ohio case law has failed to find a case precisely on point, that is, where a party raised a defense in its answer, raised the defense in a motion for summary judgment, failed to specifically mention the defense at trial, but then moved for JNOV after trial. However, the Ohio Supreme Court's discussion in Gallagher v. Cleveland Browns Football Co. (1996), 74 Ohio St.3d 427, and Dardinger v. Anthem Blue Cross 
Blue Shield, 98 Ohio St.3d 77, 2002-Ohio-7113, is helpful. In Gallagher, the defendant asserted a defense in its answer that it failed to reassert either before or during the trial, but then raised it in a motion for JNOV. The court found the defendant waived the defense by failing to raise it in a timely manner, explaining:
 {¶ 20} "We require the defendant to put forth alleged defenses, and arguments to support them, in order to define the issues in a case to put both the plaintiff and the trial court on notice of the particular defense to be at issue so that the litigation may be formulated and shaped. When the defendant interposes an avoidance or affirmative defense which appears to have merit, the defense frequently becomes an issue upon which the case may turn. Generally, the plaintiff must vigorously oppose the defense at the earliest opportunity. The idea that a defendant waives a defense he or she fails to raise is especially applicable when the defendant supposedly has available a defense that, if established, is of such extraordinary strength that it can prevent the plaintiff from making a prima facie negligence case. If a plaintiff is not put on notice of such a defense, he or she of course should not be expected to anticipate it, as the plaintiff cannot counter a defense that has never been introduced as an issue. Likewise, a trial judge is not required to anticipate the existence of a defense that is not raised. To require a trial court to grant a defendant judgment as a matter of law on an issue never timely raised would fly in the face of fundamental rules of our adversarial system of trial, which place specific responsibilities on parties involved in litigation to shape the course of the trial." Id. at 436.
 {¶ 21} Although the issue in Gallagher was the failure to raise primary assumption of risk, and the case is distinguishable for that reason alone, at first glance, the above reasoning set forth in Gallagher seems appealing. However, we find there are several distinctions between Gallagher and the present case that make them distinguishable. In finding that the defendant did not timely raise the defense in Gallagher, the court seemed to rely heavily on the fact that the defendant did not raise the defense in a motion for summary judgment prior to trial, in which such a full and complete defense would be expected to be raised. Id. at 433-434. In the present case, PPG raised the statute of limitations issue in its motion for summary judgment filed prior to trial, thereby putting the court and Luft on notice. Further, the court in Gallagher found that the policy reason behind the requirement that a defendant has a responsibility to make a defense an issue by calling it to the trial court's attention prior to the jury reaching a verdict was based on the fundamental tenet of jury trial procedure that the judge decides questions of law, and the jury, as factfinder, then decides questions of fact. Id. at 436. The court said that the entire system of trial procedure is built around this basic proposition, which would be turned on its ear if we allowed the jury first to decide questions of fact, and then expected the trial court to rule on pure issues of law after the jury returns a verdict. Id. However, in the present case, the defense at issue, the statute of limitations, is not a pure issue of law. Rather, the date of the accrual was an issue of fact for the jury, and the application of the statute of limitations to such factual determination was an issue of law to be decided by the trial court. See Cyrus v. Henes (1993), 89 Ohio App.3d 172, 175, reversed on other grounds (1994),70 Ohio St.3d 640. Thus, the trial court could not address the issue of law until the jury first made a factual determination regarding the date the cause of action accrued. In addition, the court in Gallagher indicated that the defendant failed to present evidence at trial to support such a defense. However, in the present case, throughout the witnesses' testimony, PPG asked numerous witnesses about the timeline of events and the specific dates on which particular actions were taken or facts known. At least ostensibly, these questions seem pointed at the statute of limitations issue. We find these differences are sufficient enough to take the present case out of the purview of Gallagher.
 {¶ 22} In Dardinger, supra, the court relied upon Gallagher to find that a defendant had waived an argument it raised for the first time in a motion for JNOV. In Dardinger, a decedent's estate was awarded damages against the defendants, Anthem Insurance Companies, Inc. ("AICI") and its wholly-owned subsidiary, Anthem Blue Cross and Blue Shield ("Anthem"), for breach of contract and bad faith regarding the defendants' handling of the insured decedent's insurance claim. The defendants filed a motion for JNOV, in which AICI for the first time tried to distinguish itself from Anthem for the purposes of the bad-faith claim and punitive damages awarded against AICI. The trial court denied the motion for JNOV, which was reversed by the court of appeals. The Ohio Supreme Court then reversed the court of appeals. The Supreme Court found that because AICI participated in and perpetuated the impression that Anthem and AICI were indistinguishable as to their potential liability to the estate both before and during the trial — AICI waived the argument that it lacked privity with the estate. In finding waiver, the Supreme Court focused on AICI's failure to raise the issue of privity in pretrial motions, such as a motion for summary judgment, and AICI's trial actions in failing to present any evidence on the issue during trial. Dardinger, at ¶ 127. The Supreme Court further found it was insufficient that AICI had denied generally that the decedent was an insured of AICI in its answer to the complaint. Id. at ¶ 142. However, Dardinger is also distinguishable from the present case. As explained above, in the present case, PPG raised the issue of statute of limitations in a pretrial summary judgment motion, clearly raised the issue in its answer, and elicited testimony at trial regarding the specific dates upon which various key events occurred, thereby sufficiently putting the court and Luft on notice. Therefore, Dardinger is also inapplicable to the present facts.
 {¶ 23} We note that we believe the much more prudent course of conduct for a defendant desiring to rely at trial upon a statute of limitations defense previously raised in its answer and pretrial motion would be for the defendant to at least mention "statute of limitations" at some point during the course of the trial, be it in a pretrial brief, during opening argument, while questioning a witness, during closing arguments, in proposed jury instructions, or in jury interrogatories. Taking such actions would make certain that the other parties, as well as the court, were aware that the defendant had not abandoned that defensive theory. However, under the circumstances of this case, we believe that PPG's actions in raising the statute of limitations defense in its answer and in a motion for summary judgment prior to trial, as well as PPG's examination of the witnesses on issues relating to the issue, sufficiently preserved the issue of law for the trial court to determine upon JNOV.
 {¶ 24} With regard to the merits of the JNOV motion, PPG first asserts that neither the jury interrogatory responses nor the record support any reasonable conclusion other than that the statute of limitations had expired prior to the filing of Luft's complaint. Pursuant to Civ.R. 50(B), this court reviews PPG's motion for JNOV de novo. Schafer v. RMS Realty (2000), 138 Ohio App.3d 244, 257. In ruling on a motion for JNOV, the evidence is construed most strongly in favor of the nonmovant, who is also given the benefit of all reasonable inferences from the evidence. Ruta v. Breckenridge-Remy Co. (1982), 69 Ohio St.2d 66,68. The court must not weigh the evidence or the credibility of the witnesses when reviewing such a motion. Osler v. Lorain (1986),28 Ohio St.3d 345, syllabus. A jury is free to believe all, part, or none of the testimony of any witness who testifies before it. Rogers v. Hill (1998), 124 Ohio App.3d 468, 470. A motion for JNOV should be denied if there is substantial evidence upon which reasonable minds could come to different conclusions on the essential elements of the claim. Posin v. A.B.C. Motor Court Hotel (1976), 45 Ohio St.2d 271, 275.
 {¶ 25} The CSPA prohibits suppliers from committing unfair, deceptive, or unconscionable acts or practices in connection with consumer transactions. Sproles v. Simpson Fence Co. (1994),99 Ohio App.3d 72, 80, citing R.C. 1345.02 and 1345.03. R.C. 1345.10(C), which establishes a statute of limitations for an action under the CSPA, provides: "An action under section 1345.01 to 1345.13 of the Revised Code may not be brought more than two years after the occurrence of the violation which is the subject of suit * * *." The CSPA also states that a deceptive or unconscionable act or practice is a violation "whether it occurs before, during, or after the transaction." See R.C. 1345.02(A) and1345.03(A). Further, while the provisions of the CSPA covering actions for rescission of consumer contracts are governed by the discovery exception to the two-year statute of limitations, claims for damages, such as Luft's claim in this case, asserted under the CSPA do not fall within the discovery exception; R.C. 1345.10(C) sets forth an absolute two-year statute of limitations for such damage actions. Cypher v. Bill Swad Leasing Co. (1987), 36 Ohio App.3d 200, 202.
 {¶ 26} PPG's argument relies upon stringing together answers to several of the jury's interrogatories to weave the conclusion that any violation of the CSPA must have occurred no later than 1993, and because Luft did not file his action until April 29, 1999, any CSPA violations were barred by the two-year statute of limitations. The trial court found that although the jury interrogatories indicated that PPG engaged in conduct that violated the CSPA in 1989, the interrogatories did not specify that all violations of the CSPA occurred in 1989.
 {¶ 27} We first note that PPG inappropriately focuses on the transactions underlying the action to argue that any CSPA violations are barred by the statute of limitations. PPG points out that the first transaction was the construction and painting in 1989, and the second transaction was Luft's purchase of paint for the 1991 construction and painting, and, thus, the actions accrued at that time. However, the dates of the transactions underlying the causes of action based upon the CSPA are immaterial. As indicated above, the CSPA provides that a deceptive or unconscionable act or practice is a violation whether it occurs before, during, or after the transaction. What is relevant is the "occurrence" of the violation. The statute of limitations commences to run from the date of the "occurrence" of the violation, which is not necessarily the date of any underlying transaction. In the present case, Luft alleges several CSPA violations that were not contemporaneous with the purchase or use of PPG's products. Therefore, the actual date of painting or purchase of paint is irrelevant to these claims.
 {¶ 28} Although we follow PPG's logic in its cobbling together of certain answers to select interrogatories, we find that the jury's responses to several key interrogatories raise doubt as to whether the jury necessarily found that all CSPA "occurrences" took place prior to 1993. For instance, Interrogatory No. 13 asked, "Do you find by a preponderance of the evidence that PPG misrepresented any warranty?" The jury answered "yes." Standing alone, this query did not specify what warranty was misrepresented and the date of such misrepresentation(s). Although other interrogatories did specify the date of certain CSPA warranty misrepresentations, none of these, by necessity, precluded a finding that other warranty misrepresentations were made at other times within the statute of limitations period. PPG's citation to Interrogatory No. 15 to support such a proposition is unavailing. Although the jury did find in Interrogatory No. 15 that PPG did not attempt to "disclaim" its 15-year express warranty between 1994 and 1998, this does not prevent the jury from finding independently that PPG still violated the CSPA from 1994 to 1998 by "misrepresenting" a warranty, as it did in Interrogatory No. 13. PPG chose not to give more specific interrogatories to the jury to clarify this issue, and we cannot speculate as to what misrepresentations the jury found, when they occurred, and precisely who made them.
 {¶ 29} In addition, Interrogatory No. 20 asked, "Do you find by a preponderance of the evidence that defendant PPG knowingly made a misleading statement of opinion to plaintiff upon which plaintiff was likely to rely to his detriment?" The jury answered "yes." One enumerated factor in the CSPA is whether the supplier knowingly made a misleading statement of opinion upon which the consumer was likely to rely to his determent. R.C. 1345.03(B)(6). The jury made no finding as to the date the misleading statement(s) was made by PPG in this interrogatory or any other. Any statement must have been made on or after April 27, 1997, in order to be within the statute of limitations period. Indeed, Luft alleged statements by PPG and its representative were made to him after this date. He testified that Work came to his farm in late 1997 and told him that the paint problem was caused by ultraviolet rays and the fact that it was an oil-based paint, although Luft was confused because McGlade and Bissell used latex paint. Work also told him that the paint was a PPG product and it was a PPG problem due to a breakdown of the paint. Work told him that he should go back to work and not worry about the paint. Luft testified that Work told him PPG would take care of the problem. Work also came to the farm in May 1998 with PPG's attorney. Luft testified that when Work was in the presence of PPG's attorney, Work said that he never told Luft that PPG would take care of the problem, but a few minutes later, Work admitted to Luft in private that he had lied to protect his job. Work denied that he made this admission to Luft. Whether the jury found that these were the statements that were misleading is speculation. PPG chose not to query the jury to find out what statements it found misleading and when they were made, and it cannot now complain about the vague responses to the broad jury questions propounded by Luft. Thus, because the jury's responses to Interrogatory No. 13 and 20, at a minimum, do not specify the dates of the CSPA violations, and no other interrogatory necessarily precludes a finding that CSPA violations occurred within two years of the filing of the complaint, we cannot find that the trial court erred in refusing to grant PPG's motion for JNOV on the statute of limitations issue. Therefore, PPG's first assignment of error is overruled.
 {¶ 30} PPG argues in its second assignment of error the trial court abused its discretion when it awarded $86,115.95 in attorney fees against PPG. R.C. 1345.09(F)(2) provides for an award of reasonable attorney fees to the prevailing party in actions where a knowing violation of the CSPA occurs. A trial court's determination of an award of attorney fees will not be disturbed on appeal absent an abuse of discretion. Bittner v. Tri-County Toyota, Inc. (1991), 58 Ohio St.3d 143,146. An abuse of discretion is "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621. The Bittner court also added some extra oomph to the abuse of discretion standard, cautioning reviewing courts not to interfere with a fee award unless the amount of fees determined is so high or so low as to shock the conscience. Bittner, at 146, quoting Brooks v. Hurst Buick-Pontiac-Olds-GMC, Inc. (1985), 23 Ohio App.3d 85, 91.
 {¶ 31} In Bittner, the Ohio Supreme Court described the proper procedure a trial court is to follow when determining the amount of reasonable fees to award pursuant to a CSPA violation: "[T]he trial court should first calculate the number of hours reasonably expended on the case times an hourly fee, and then may modify that calculation by application of the factors listed in DR 2-106(B)." Bittner, at 145.
 {¶ 32} The factors in DR 2-106(B) are: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.
 {¶ 33} The trial court awarded $86,115.95 in attorney fees to Luft against PPG. PPG's main argument is that the trial court neither sufficiently distinguished between claims for which attorney fees are and are not recoverable nor distinguished between fees incurred with regard to parties other than PPG. PPG argues that there were seven other defendants and numerous claims against each, for which recovery was granted against PPG on only one claim. We first note that PPG cites 12 specific instances in which the trial court allegedly awarded attorney fees to Luft that were not expended in pursuing viable claims or claims against PPG, terming these as "highlights" of the trial court's errors. However, this court will not search the record for evidence to support an appellant's argument as to any alleged error. State v. Watson (1998),126 Ohio App.3d 316, 321. Thus, we will not attempt to root out any alleged error PPG has not specifically pointed out to this court.
 {¶ 34} We cannot find that the trial court abused its discretion with regard to the 12 specific instances cited by PPG. It is true that attorney fees should not be awarded for services on unsuccessful claims that are distinct from successful claims. Hensley v. Eckerhart (1983),461 U.S. 424, 103 S.Ct. 1933. However, when it is not possible to divide claims in this fashion, such as when claims not covered under the CSPA involve a common core of facts with claims arising under the CSPA, then the court may award attorney fees for all time reasonably spent pursuing all claims. Parker v. I F Insulation Co., Inc. (Mar. 27, 1998), Hamilton App. No. C-960602. Further, a defendant should not be required to pay attorney fees associated with services the plaintiff's counsel renders in bringing claims against other unrelated defendants. However, similar to the rationale in Parker, if the fees incurred in taking some action jointly against all defendants are inexplicably intertwined with each other due to a common core of facts or circumstances, a court should be permitted to award any reasonable fees incurred in taking such action against any one of those defendants.
 {¶ 35} In reviewing the instances cited by PPG, it is clear that most of them fall under the tenets explained above. Much of the time of Luft's counsel was devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim or party-by-party basis. The underlying facts involved in the CSPA claims against PPG were related to the same facts underlying the other claims against PPG and the other defendants. Under these circumstances, it is difficult, if not impossible, to view such a lawsuit as a series of discrete claims and actions. See Hensley at 434-435. With regard to PPG's specific arguments relating to the preparation of the original complaint, the drafting of the amended complaint, the September 1999 site visit, Luft's deposition, the settlement demand to PPG and Forest, the March 2000 status conference, the April 2000 mediation, Luft's memorandum contra the summary judgment motions filed by numerous defendants, and the August 14, 2000 review of the trial court's decision on defendants' summary judgment motions, we find that the fees incurred in rendering these services were intertwined with all of the claims against PPG and with all of the parties mutually. We also note that the descriptions for many of these services in the fee statements include broad, general descriptions, such as "Meet with client" and "Call to client," that cannot definitively be attributed to any certain claim or party. Therefore, we find that the trial court did not abuse its discretion in failing to separate the fees for each claim and party under these circumstances.
 {¶ 36} PPG also argues that between August 14, 2000, and August 9, 2001, the trial court proceeded from summary judgment through trial, with only Perry and Forest remaining involved in the litigation. The trial court excluded fees for numerous services during this period that it found could be allocated to defendants other than PPG. Although PPG claims there were other services that did not relate to PPG, it fails to specifically direct us to any. Therefore, this argument is without merit.
 {¶ 37} PPG also argues that three hours billed on July 16, 1999, for "preparation of discovery responses" could not have been related to PPG because Luft filed a motion for default judgment against PPG three days later claiming that PPG had not yet filed an answer. However, PPG does not demonstrate error in this regard. PPG fails to divulge that it actually had filed an answer on June 7, 1999, although Luft was unaware of it when he filed the motion for default judgment because, apparently, PPG failed to timely serve the answer on Luft. Therefore, there is no way for this court to know whether PPG requested any discovery after filing its answer on June 7, 1999, and whether the entry on July 16, 1999, related to PPG. More importantly, the July 16, 1999 entry also indicated that part of the fees were for a "Meet[ing] with Peter." This court cannot speculate how much of the time involved the meeting, which invariably included some discussion of PPG, and how much involved any alleged non-PPG discovery requests. The same is true for the July 28, 1999 services that refer to responses to a document request and a "Call to client." Likewise, an August 12, 1999 entry refers to a "Meet[ing] with client regarding document production" and a telephone conference with IKON. This court has no way to determine whether these services did not relate to PPG.
 {¶ 38} PPG further cites an entry for February 15, 2000, and asserts that it cannot be assessed all of the fees relating to such services because Forest and Perry were also referenced in the entry. However, this entry also refers to a "report to client," a telephone conference with Luft's former attorney, and an affidavit draft, all of which may have regarded PPG. Further, any correspondence with Forest regarding settlement invariably related to PPG. PPG also cites an entry for February 28, 2000, and claims that all of the hours expended on that date were for reviewing Forest's discovery responses and a motion to strike. However, the entry also indicates that trial counsel met with Luft and completed "correspondence to other counsel." This court cannot surmise how much time was spent on either of these activities and whether they were wholly unrelated to PPG. Further, as Luft's expert explained, the fact that Luft had to procure documentation from other parties does not necessarily mean that such documents were not in furtherance of Luft's CSPA claims against PPG. In sum, PPG has not shown the trial court abused its discretion.
 {¶ 39} PPG also argues the trial court abused its discretion in ordering PPG to pay for fees associated with services rendered by Luft's former counsel in the amount of $10,575.58 because former counsel was retained in the pre-litigation stages to reach a settlement with multiple parties. However, we can find no prohibition against awarding attorney fees for services rendered prior to the filing of the complaint for a CSPA violation. Further, the fee statements of Luft's former counsel refer to Perry and Forest only a miniscule number of times. The descriptions on the fees statements refer to PPG almost exclusively. Further, every service that was completed relating to Perry and Forest also included services related to PPG. Therefore, PPG has failed to show the trial court abused its discretion in awarding fees associated with Luft's former counsel.
 {¶ 40} PPG also contends that the award of attorney fees was excessive in relation to the compensatory damages the jury awarded. The jury awarded $8,000 in compensatory damages, and the trial court awarded approximately $86,000 in attorney fees against PPG. However, as the court in Tanner v. Tom Harrigan Chrysler Plymouth, Inc. (1991),82 Ohio App.3d 764, observed:
 {¶ 41} "Under [R.C. 1345.09(F)] a trial court, in its discretion, may award a consumer reasonable attorney fees when the supplier in a consumer transaction intentionally commits an act or practice which is deceptive, unfair or unconscionable. Einhorn v. Ford Motor Co. (1990),48 Ohio St.3d 27, 548 N.E.2d 933. The Consumer Sales Practices Act, R.C. Chapter 1345, is a remedial law designed to compensate for traditional consumer remedies and must be liberally construed pursuant to R.C. 1.11. Id. at 29, 548 N.E.2d at 935. Since recoveries under this Act are often small and generally insufficient to cover attorney fees, without an award of attorney fees many consumers would be persuaded not to sue. Id. at 30, 548 N.E.2d at 935-936. The legislative purpose of the section allowing an award of attorney fees was `to prevent unfair, deceptive, and unconscionable acts and practices, to provide strong and effective remedies, both public and private, to assure that consumers will recover any damages caused by such acts and practices, and to eliminate any monetary incentives for suppliers to engage in such acts and practices.' (137 Ohio Laws, Part II, 3219.) Awarding attorney fees under the Act allows private redress of individual wrongs, but also may benefit the community generally because a judgment for the consumer may discourage violations of the Act by others. Bittner v. Tri-County Toyota, Inc. (1991), 58 Ohio St.3d 143, 569 N.E.2d 464. `Prohibiting private attorneys from recovering for the time they expend on a consumer protection case undermines both the purpose and deterrent effect of the Act.' Id. at 144, 569 N.E.2d at [465]." Id. at 765-766.
 {¶ 42} There is no limit or compensatory damages/attorney fees "ratio" included in the CSPA to cap the attorney fees that a prevailing party may be awarded. "A rule of proportionality would make it difficult, if not impossible, for individuals with meritorious * * * claims but relatively small potential damages to obtain redress from the courts * * *." Riverside v. Rivera (1986), 477 U.S. 561, 578, 106 S.Ct. 2686. Bittner requires only that the fees be reasonable. Luft's expert testified at the hearing on attorney fees that the fees charged by Luft's current and former trial counsel were reasonable and typical for an action brought pursuant to the CSPA. The expert examined all of the factors explained in Bittner in concluding that the fees were reasonable. The trial court considered the testimony of the expert and agreed that the fees charged were reasonable and necessary. In sum, we find no abuse of discretion based merely upon the disparity between the amount of compensatory damages and the attorney fees awarded. An attorney may expend inordinately large amounts of time and energy pursuing a claim that reaps relatively small monetary benefits for a prevailing plaintiff. Bittner, at 144. The attorney fees awarded in the present case are consistent with the purpose of the CSPA to make private enforcement of the CSPA attractive to consumers who otherwise might not be able to afford or justify the cost of prosecuting an alleged CSPA violation, which, in turn, works to discourage CSPA violations in the first place via the threat of liability for damages and attorney fees. Thus, this argument is without merit. PPG's second assignment of error is overruled.
 {¶ 43} Luft argues in his first cross-assignment of error the trial court erred by denying prejudgment interest on the damages award for PPG's CSPA violations. Luft requested prejudgment interest on the damages award against PPG based upon R.C. 1343.03(A) and (C). The determination to award prejudgment interest rests within the trial court's sound discretion. Scioto Mem. Hosp. Assn., Inc. v. Price Waterhouse (1996), 74 Ohio St.3d 474, 479. The trial court's finding on this issue will not be reversed absent a clear abuse of discretion. Kalain v. Smith (1986), 25 Ohio St.3d 157, 159.
 {¶ 44} The trial court did not address in its decision Luft's request for prejudgment interest under R.C. 1343.03(A), which provides:
 {¶ 45} "In cases other than those provided for in sections 1343.01
and 1343.02 of the Revised Code, when money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate of ten per cent per annum, and no more, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract."
 {¶ 46} Thus, prejudgment interest under R.C. 1343.03(A) is based on the premise that a party to a contract should not retain the use of money owed under a contract when that amount is due and payable to the other contracting party. See Miller v. Gunckle, 96 Ohio St.3d 359,2002-Ohio-4932, at ¶ 28.
 {¶ 47} PPG argues that the jury determined it did not breach any contract or warranty, and, thus, R.C. 1343.03(A) does not apply to the CSPA violations found by the jury. We first note that although Luft indicated in the opening sentence of his motion for prejudgment interest that he was requesting such based upon both R.C. 1343.03(A) and (C), in his memorandum in support, his only argument in his motion was that he is entitled to prejudgment interest because PPG never made a good-faith offer to settle, which is a predicate for only R.C. 1343.03(C). Therefore, we could find that Luft waived any argument with regard to R.C. 1343.03(A) because he failed to raise any arguments with regard to such at the trial court level and contributed to the trial court's failure to address the issue. Nevertheless, we find he was not entitled to prejudgment interest pursuant to R.C. 1343.03(A). R.C. 1343.03(A) provides for an award of prejudgment interest only in contract actions. Luft brought claims sounding in both contract and tort. The jury interrogatories make clear that the jury did not find PPG breached any express warranty or breached any contract. See Allied Paper, Inc. v. H.M. Holdings, Inc. (1993), 86 Ohio App.3d 8, 18 (a breach of warranty is a contract claim). The jury did find in its interrogatories that PPG misrepresented a warranty and made a misleading statement of opinion. Thus, the damages awarded properly by the jury resulted from tortious conduct of PPG. Although the action may have arisen out of an underlying contract, the damages award was due to tortious conduct. Consequently, R.C. 1343.03(A) does not apply. See Dobbins v. Kalbaugh, Summit App. No. 20918, 2002-Ohio-6465. For this reason, Luft was not entitled to prejudgment interest under R.C. 1343.03(A).
 {¶ 48} With regard to R.C. 1343.03(C), that section provides:
 {¶ 49} "Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."
 {¶ 50} In the present case, the trial court held that although the jury found that PPG violated the CSPA by committing unfair or deceptive trade practices and awarded $8,000 for that violation, the jury found that PPG had not committed other violations of the CSPA, which supports the existence of a good-faith, objectively reasonable belief that PPG had no liability. The trial court further found that while PPG's liability was found to be beyond a nominal settlement amount, PPG's settlement offer was not so far removed from the amount of the jury's award so as to constitute an absence of a good-faith settlement offer.
 {¶ 51} The determination of lack of good faith is within the trial court's discretion. Moskovitz v. Mt. Sinai Med. Ctr. (1994),69 Ohio St.3d 638, 658. The Ohio Supreme Court has set forth factors to be considered in determining whether a party has made a good-faith effort to settle. "A party has not `failed to make a good faith effort to settle' under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer." Id. at 658-659, quoting Kalain, supra, syllabus.
 {¶ 52} We agree with the trial court's finding regarding good faith. PPG made an undocumented offer of $2,500 to Luft, and the jury awarded $8,000 in damages. Although Luft urges this court to compare PPG's offer with the ultimately trebled award of $24,000, we find such to be minimally significant to any analysis of good faith in the present case. PPG reasonably and objectively believed it had no liability. The jury agreed that PPG did not breach any contract, commit any fraud, negligently misrepresent any matter, or breach any express warranty. Further, Luft gave little substantiation of the painting history or dates of such regarding the structures in question for PPG to definitively determine its liability to Luft. PPG also lacked information as to the type, thickness, and number of initial coats of the structures, as well as similarly lacking information regarding subsequent applications. The contract specifications between Luft and the other parties failed to indicate the type of paint used to coat the structures. PPG's chemical analysis also showed obvious differences between the wet paint samples taken from Luft and dry scrapings from the barn. The barn scrapings showed talc as an extender pigment, which is typically found in lower-cost acrylic paint, causing PPG to question whose product was used in the original and repaint work. PPG also noted that the main house, which used Olympic overcoat, was in much better condition than the newer structures, causing PPG further suspicion as to what product was used on each of these buildings. PPG also noted in its coating performance review that despite its doubt as to the origin of the original coatings, it expended several thousand dollars in attempts to help Luft remedy the problem. Further, although Luft claims that PPG also failed to cooperate in discovery, repeatedly delayed proceedings, and demonstrated an attitude of contempt for him before and during the legal proceedings, he cites no specific examples. For these reasons, we find the trial court did not abuse its discretion in failing to award prejudgment interest pursuant to R.C. 1343.03(C). Luft's first cross-assignment of error is overruled.
 {¶ 53} Luft argues in his second cross-assignment of error the trial court erred by granting summary judgment to Francis-Schulze, Forest, Miller, Zink, and Perry (sometimes referred to as "non-PPG defendants"). The trial court found that these parties were entitled to summary judgment because the statute of limitations had expired as to the claims against each party. The trial court further held that Luft knew or should have known of his injury when he discovered the problems with the paint in September 1992. In a summary judgment exercise, the movant must prove there is no genuine issue as to any material fact to be litigated; the movant is entitled to judgment as a matter of law; and, viewing the evidence in a light most favorable to the nonmoving party, reasonable minds can come to but one conclusion, and that conclusion is adverse to the nonmoving party. Midwestern Indemn. Co. v. Wiser (2001),144 Ohio App.3d 354, 357. An appellate court conducts a de novo review of a trial court's granting of a motion for summary judgment. Id. at 358.
 {¶ 54} Luft sets forth numerous specific arguments as to why the trial court erred in granting summary judgment. Thus, in determining whether the trial court erred in finding that the claims against the non-PPG defendants were barred by the statute of limitations, we will address each of the specific arguments set forth by Luft in his brief. Luft first contends that the statute of limitations had not expired as to any of the claims against the non-PPG defendants when he filed his complaint on April 29, 1999, because the statute did not commence on the claims against the non-PPG defendants until May 1998, when PPG first informed Luft that the non-PPG defendants may be responsible for the failure of the paint. Luft contends that not only is the date of discovery of his injury a factor in determining when an action accrues, but the court should have also looked at when he discovered that the injury was caused by a particular defendant, citing Norgard v. Brush Wellman, Inc., 95 Ohio St.3d 165, 2002-Ohio-2007. The trial court found that Luft's lack of awareness that defendants other than PPG were responsible for the problems did not toll the running of the statute of limitations.
 {¶ 55} In Norgard, the Ohio Supreme Court departed from the general rule that a statute of limitations begins to run at the time the wrongful act was committed. In that case, an employee sued his employer for personal injuries he suffered from exposure to certain chemicals. The trial court granted summary judgment to the employer, finding the employee's claims were barred by the two-year statute of limitations set forth in R.C. 2305.10. The trial court found that the limitations period commenced when the employee first became ill in August 1992, rather than when he discovered in October 1995 that his employer knew about the conditions at the company. The court of appeals affirmed. The Ohio Supreme Court then reversed the trial court and court of appeals, finding that although a cause of action accrues and the statute of limitations begins to run at the time the wrongful act was committed, the discovery rule is an exception to this general rule and provides that a cause of action does not arise until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, that he or she was injured by the wrongful conduct of the defendant. Id. at ¶ 8. The court cited with approval O'Stricker v. Jim Walter Corp. (1983),4 Ohio St.3d 84, in which the court found that the discovery rule entails a two-pronged test i.e., discovery not just that one has been injured but also that the injury was "caused by the conduct of the defendant" — and that a statute of limitations does not begin to run until both prongs have been satisfied. Id. at 86, paragraph two of the syllabus.
 {¶ 56} Initially, we note that an argument may be made that the test enunciated in Norgard should be construed very narrowly to apply only to employer intentional tort cases. The syllabus of Norgard is very narrow: "A cause of action based upon an employer intentional tort accrues when the employee discovers, or by the exercise of reasonable diligence should have discovered, the workplace injury and the wrongful conduct of the employer." But, see, Kay v. Cleveland, Cuyahoga App. No. 81099, 2003-Ohio-171, at ¶ 27 ("the Norgard decision essentially established a new rule for determining when a statute of limitations begins to run in a case brought under R.C. 2305.10").
 {¶ 57} Regardless, even if the two-part statute of limitations test enunciated in Norgard applies to actions other than employer intentional tort cases, we find that circumstances in the present case would fall outside the Norgard test. According to Luft's affidavit, he knew that the injury may have been "caused by the conduct of" Francis-Schulze, Forest, Miller, Zink, and Perry, at the time he discovered his injury, i.e., when the paint began to peel, discolor, and fade. Luft testified in his November 1999 deposition that in September 1992, he first began to notice that the paint on the barn, walkway I, and garage I was beginning to fade and bleach. He further testified that in September 1992, he knew the paint was not performing right. Clearly, by September 1992, Luft knew the roles that Francis-Schulze, Forest, Miller, Zink, and Perry had played in painting his structures. Luft had called Perry to complain about the original paint job on the barn, walkway I, and garage I in the spring of 1989, and Zink inspected the structures. Luft admits in his affidavit that, at that time, Zink informed him that both Forest and Francis-Schulze were involved in the painting process. Luft met with Perry, Forest, and Francis-Schulze on his property in June 1989. He knew that Perry then hired two men to repaint the structures. Further, Luft then hired Perry again to construct garage II and walkway II.
 {¶ 58} Based upon these facts, that Luft was experiencing problems with the paint in September 1992, which he knew had been applied by Perry and Forest and supplied by Francis-Schulze, was enough for him to suspect that the conduct of Perry, Forest, and Francis-Schulze may have been wrongful. The problem he noticed in September 1992 was a sufficient "alerting event" that placed Luft on notice of the need to investigate an action against these known parties. This is not a case where the action could accrue only when the plaintiff acquired knowledge about the defendant above and beyond the injury itself. See Norgard, at ¶ 17. Luft became aware of the identity of these parties in 1989 and was aware they had all played a part in supplying or applying the paint. He did not need to wait and rely upon PPG to inform him that the other parties may be responsible for his injury. That Luft had sufficient knowledge to suspect other non-PPG parties were responsible for his damages prior to May 1998 is evident by his various contacts with Perry, Zink, Forest, and Francis-Schulze for the first several years after the initial paint job. These were the first parties from which he sought an informal remedy after discovering the defective paint job, and he should have also sought his legal remedies from these same parties within the proper statutory period after noticing the defective product performance. Even if Luft did not know what the statutes of limitations were for his various claims in September 1992, "ignorance of the law does not toll the statute of limitations." Lynch v. Dial Finance Co. of Ohio No. 1, Inc. (1995),101 Ohio App.3d 742, 748. Further, although Luft may not have known some of the specific underlying facts regarding the actions of some of these parties, a plaintiff need not have discovered all the relevant facts necessary to file a claim in order to trigger the statute of limitations. Flowers v. Walker (1992), 63 Ohio St.3d 546, 549. Therefore, we do not find that the statute of limitations as to the non-PPG defendants first commenced in May 1998, when PPG informed Luft that other parties may be responsible for the failure of the paint.
 {¶ 59} We also note that although Luft averred in his May 18, 2000 affidavit that he did not begin to notice the corrective paint job was starting to break down until the "spring of 1993," this conflicted with his deposition testimony that he noticed the paint discoloring in September 1992. Where a plaintiff testifies to something in a deposition, inconsistent statements in a later affidavit cannot establish a genuine issue of material fact. Cleveland v. Policy Management System Corp. (1999), 526 U.S. 795, 119 S.Ct. 1597. There is no logical reason to allow a person who has been examined in deposition to raise an issue of fact simply by submitting a later affidavit, which contradicts his/her earlier testimony. Barile v. East End Land Dev. (Dec. 23, 1999), Lake App. No. 98-L-149. Thus, Luft has raised no issue of fact on this issue.
 {¶ 60} Luft next contends that the written breach of contract claims against Perry, Miller, and Zink based upon the original contract in 1989 should have been submitted to the jury. Luft argues that although he does not possess the contract, he supplied other supporting documents that accurately reflected the terms of that agreement and the obligations of the parties. To support the existence of a written contract, Luft submitted to the trial court copies of a February 14, 1989 affidavit, waiver of lien, and acknowledgement of payment signed by Miller; a February 14, 1989 affidavit executed by Miller; a January 4, 1989 Perry invoice, and Luft's February 3 and 14, 1989 checks payable to Perry. The trial court found that these documents supplied by Luft to support the existence of a written contract were insufficient.
 {¶ 61} Upon review, we agree with the trial court's determination that Luft has failed to demonstrate the existence of a written contract. Although Luft alleged that there was a written contract between him and Perry in his May 18, 2000 affidavit, he testified in his November 1999 deposition that:
 {¶ 62} "Q. With regard to the first contract, the 1989 —
 {¶ 63} "A. Yes, sir.
 {¶ 64} "Q. — contract, did you enter into that contract personally yourself, or was that contract entered into by Merryhill Farms, Inc.?
 {¶ 65} "A. Personally, myself. However, financing for that, for the barn, walkway and garage number 1, I had set up a corporation to protect myself against suits as far as any real estate corporation. And as my principal residence, I signed that as the corporation and myself personally on the mortgage. So I entered into it on a hand shake with Mr. Miller on a personal basis.
 {¶ 66} "Q. Okay. I had thought that you had testified earlier that there was a written contract regarding the 1989 construction.
 {¶ 67} "A. That's correct. We did discuss that. And then it was corrected, because what I thought was a written contract was actually a lien release.
 {¶ 68} "Q. Okay. So your recollection today is that there was no written contract regarding the scope of the work —
 {¶ 69} "A. I'm not —
 {¶ 70} "Q. — in 1989?
 {¶ 71} "A. I'm not going to say that there wasn't a written contract. I have not seen evidence of it. I can't imagine that I would do a project of that size without a written contract."
 {¶ 72} From this testimony, it is clear that Luft has no memory of there ever being a written contract. He admitted that he had never seen any evidence of a written contract. As explained above, despite his conflicting affidavit statement, where a plaintiff testifies to something in a prior deposition, inconsistent statements in a later affidavit cannot establish a genuine issue of material fact. Cleveland, supra. In the present case, Luft never attempted to resolve the disparity between his deposition testimony and his affidavit averment. Luft never explained why he changed his opinion from the time of his deposition in completing his affidavit.
 {¶ 73} Further, with regard to the documents attached to Luft's affidavit to demonstrate the existence of a written contract, none of the attached documents refer to a "written" contract. Although the affidavit/waiver of lien/acknowledgment of payment document refers to a "contract," such would not raise a genuine issue of material fact as to the existence of a written contract. Its generic references to a "contract" do not prove that a written contract ever actually existed. Further, the document is a standard form with fill-in blanks; thus, that it refers to a contract would not convince a reasonable mind that a written contract actually existed in this particular case. Although it is apparent that an agreement existed between Luft and Perry, there is no evidence that a written agreement existed with regard to the 1989 construction. Therefore, there was no genuine issue of material fact as to whether a written contract existed with regard to the 1989 construction.
 {¶ 74} Luft next contends that the actions of Perry, Forest, Francis-Schulze, and PPG, in agreeing to toll the time in which litigation was required, estopped them from asserting the statute of limitations as a defense, citing Hutchinson v. Wenzke (1999),131 Ohio App.3d 613. Under Ohio law, the doctrine of equitable estoppel may be employed to prohibit the inequitable use of the statute of limitations. Walworth v. BP Oil Co. (1996), 112 Ohio App.3d 340, 345. In order to prevail on a claim of equitable estoppel, a plaintiff must prove four elements: (1) that the defendant made a factual misrepresentation; (2) that it was misleading; (3) that it induced actual reliance which is reasonable and in good faith; and (4) that it caused detriment to the relying party. Romine v. Ohio State Hwy. Patrol (2000),136 Ohio App.3d 650, 654. In the context of a statute of limitations defense, a plaintiff must show either "an affirmative statement that the statutory period to bring an action was larger than it actually was" or "promises to make a better settlement of the claim if plaintiff did not bring the threatened suit" or "similar representations or conduct" on defendant's part. Cerney v. Norfolk W. Ry. Co. (1995),104 Ohio App.3d 482, 488.
 {¶ 75} We do not find a genuine issue of material fact. Clearly, Luft has not shown that Francis-Schulze, Forest, Miller, Zink, or Perry made any affirmative statement or promise that they would make a better settlement of any claim if Luft did not bring suit. The only representation that Francis-Schulze, Forest, Miller, Zink, and Perry made was the usual response by most businesses to customers when there is a problem with a consumer transaction — they told Luft that they would try to fix the problem. They tried and ultimately failed to satisfy Luft. If a business's statement that it would try to remedy a complaint tolled the statute of limitations, the statute of limitations for countless actions between consumer and business could be tolled indefinitely. In the present case, the businesses did not remedy the problem in a timely manner and to Luft's satisfaction, and nothing prevented Luft from filing his causes of action within the statutorily prescribed limits. The crux of the appellate court's decision in Hutchinson was that the defendants were estopped from raising the statute of limitations as a defense to the refilling of a complaint because the defendants had specifically stipulated that the prior complaint was dismissed without prejudice and could be refiled. In the present case, there was neither an agreement between the parties nor any inducement or factual misrepresentation by Francis-Schulze, Forest, Miller, Zink, or Perry preventing Luft from filing his causes of actions against them. Thus, we find Hutchinson inapplicable. Further, although Luft may have had some nonspecific belief that PPG was representing all of the defendants in its later dealings and communications with him, there is simply no reasonable evidence to support such a proposition, and Luft's unfounded, unsupported belief is insufficient. We find that even construing the evidence most strongly in favor of appellant, reasonable minds could only come to the conclusion that the doctrine of equitable estoppel is inapplicable.
 {¶ 76} Luft next argues the trial court erred in finding that his causes of action regarding the CSPA were barred by the statute of limitations. Luft contends that the actions of the non-PPG defendants were not single CSPA violations but were part of a continuing transaction. Thus, Luft asserts that the cause of action did not accrue until the final transaction was completed, citing our decision in Roelle v. Orkin Exterminating Co. (Nov. 7, 2000), Franklin App. No. 00AP-14. However, even if each CSPA violation was merely a part of a continuing transaction, Luft's CSPA claims against Francis-Schulze, Forest, Miller, Zink, and Perry were still barred by the statute of limitations. A CSPA action by a consumer must be brought within two years after the occurrence of the violation that is the subject of suit. R.C. 1345.10(C). Thus, a CSPA action accrues at the occurrence of the violation.
 {¶ 77} With regard to Forest, Luft admits in his November 8, 1999 deposition that the last time any representative of Forest made any sort of alleged representation to him that they would fix the paint job on the first barn, walkway, and garage was in 1989. Forest concurs that the last time it had contact with Luft was after Bissell and McGlade repainted the barn, garage I, and walkway I in July 1989. Therefore, a claim under the CSPA should have been brought against Forest by July 1991.
 {¶ 78} However, Luft argues that Work's statements to him in late 1997 and May 1998 should be attributed to Forest, thereby extending his "continuing transaction" with Forest to 1997 and 1998. In support of this theory, Luft claimed in his affidavit that Work's business card misrepresented to him that Work was employed by Forest when he was really employed by PPG. The business card indicated "Lawrence J. Work, North American Manager, Factory Finishing, Forest Products Group, PPG Architectural Finishes." However, the vice-president of finance for Forest, Richard Esselstein, averred in an affidavit that Work has never been employed or affiliated with Forest in any way. He also averred that the Forest Products Group Division of PPG is entirely separate and unrelated to the Ohio corporation Forest Products Group, Inc. We would also note that the business card indicates PPG Industries, Inc. in bold-faced type in the center of the card, along with the PPG and Olympic Logos, while the various PPG divisions appear in regular type directly under Work's title of "North American Manager." Further, only PPG's business address appears on the card.
 {¶ 79} Importantly, Luft's deposition testimony is more telling as to Luft's beliefs. Luft specifically testified that after the 1989 meetings with Forest and other defendants, there were no other times that he talked to a person from Forest about the problem with his barn. Luft reiterated this when he further testified that "the only time" Forest made a "representation" that they would "take care of" the paint problems was at the initial meetings in 1989. To assure that his testimony was abundantly clear during his deposition, Luft insisted a third time: "The only time, to the best of my knowledge, that [Forest was] going to help was with the barn, the walkway and garage number 1. And that was a verbal when we had a meeting, either the second or third meeting, before McGlade and Bissell." Luft does not mention his belief that Work worked for Forest and repeatedly refers to Work as a representative of PPG. He also does not indicate in his deposition that he was misled by the business card. We do not find any genuine issue of material fact as to whether Work's discussions should be attributed to Forest for purposes of determining when any CSPA violations against Forest accrued. In sum, Luft fails to demonstrate that there were any "occurrences" of CSPA violations by Forest that occurred within two years of the filing of his cause of action in 1999.
 {¶ 80} With regard to Francis-Schulze, Miller, Zink, and Perry, there is simply no action or contact between them and Luft within two years of the filing of the complaint that could form the basis of a CSPA claim. The last contact Francis-Schulze had with Luft was in the summer of 1989 with regard to the repainting of the first walkway, garage, and barn. Although Luft fails to specify how or when Zink, Miller, or Perry violated the CSPA, the last contact that either Zink, Miller, or Perry could have possibly had with Luft was in 1993 when Luft called Perry to complain about the discoloration and fading. However, Luft testified that Perry never called back. As explained above, Luft's nonspecific belief that PPG was representing all of the defendants in its later dealings and communications with him is not supported by any reasonable evidence and is unfounded. Therefore, Luft has failed to raise a genuine issue of material fact as to whether any CSPA violations were committed by Francis-Schulze, Perry, Zink, and Miller within the applicable two-year statute of limitations. For the foregoing reasons, Luft's second cross-assignment of error is overruled.
 {¶ 81} Accordingly, PPG's two assignments of error and Luft's two cross-assignments of error are overruled, and the judgments of the Franklin County Court of Common Pleas are affirmed.
Judgments affirmed.
TYACK and LAZARUS, JJ., concur.